December Term, 1840.

CHASE AND CRABB, EXECUTORS OF J. T. CHASE, vs. LOCK-
ERMAN AND OTHERS, HEIRS AND DEVISEES OF J. T. C.
December 1840.

The principle seems to be well settled in England, that as to debts by specialty, since the statute of fradulent devises, specific devisees of freehold and lease-hold estates are on the same footing, and liable to contribute in equal portions to the payment of such debts.

In this State and in England, the personal estate is the primary fund for the payment of debts, as between the real and personal representatives of the deceased, and must be first resorted to for that purpose.

And if a specialty creditor proceeds against the real estate, descended or devised, the heir or devisee who has sustained the loss, shall be allowed to stand in the place of such creditor, and to re-imburse himself out of the personal estate, provided such re-imbursement will not prejudice creditors, or other parties having more favored claims.

If the obligee recover against the heir, he may re-imburse himself out of the assets in the hands of the executor, but not to the prejudice of either a specific or general legatee.

It is only against the residuary legatee, that such an equity exists in favor of the heir—in favour of a devisee, it exists against a general, though not a specific legatee.

The general rule of marshalling assets, is to apply first, the personal estate—then lands devised to be sold for payment of debts—then lands descended;

24        v. 11

and *lastly*, estates specifically devised, even though they were generally charged with the payment of debts.

If in this State, specific legacies have been applied to pay specialty debts, the specific legatees are entitled to contribution against the devisees of the realty—and if the general personal estate, has been applied to the payment of specialty debts, and the simple contract creditors, consequently thrown upon the specific bequests, the specific legatees in that case, have a right to contribution from the devisees of the real estate.

Where a testator stands in the relation of parent, a bequest to children generally will in legal construction, embrace all who answer that description at the period of his death.

It is a rule in the construction of wills, that where there is a general and particular intent apparent upon the face, the general intent, though first expressed, will control the particular intent, if there should be a conflict between them.

Chancery treats executors and trustees with indulgence, when they act in good faith, and does not hold them liable upon slight grounds.

An administrator will be charged with interest on money kept in his hands without apparent reason, from the end of thirteen months from the date of his letters, where it appears he has been guilty of culpable negligence in so doing.

The bequest of money to be received under a decree in Chancery, is a specific bequest, and not liable to abate with general legacies. If the fund out of which such a bequest is payable fails, the legatee has no title to be recompensed out of the general personal estate.

A mortgage interest before foreclosure, is considered in equity as a chattel interest, and as such, belongs to the executor, and though the technical fee may descend to the heir, he takes it in trust for the personal representative.

But as between the real and personal representative, the mortgagee may by a manifest declaration of his intent, convert the mortgage as well as any other part of his personal estate into land, and make it pass accordingly.

Where the circumstances of a trust are such as to require the direction and indemnity of a court of equity, the practice is, to charge the costs of the suit upon the fund.

APPEAL from the Court of Chancery.

The bill in this case was filed on the 19th June 1833, by *Adam & John Miller*, praying subpœna against *Richard Lockerman* and wife, and the executors of *J. T. Chase*. The bill alleged that *J. T. C.* in his life time, executed a single bill or promissory note, to a certain *R. L. jr.*, in trust for his mother *Frances T. Lockerman*, whereby he promised to pay $1000, with interest thereon. The complainant claimed under the following assignment:

ANNAPOLIS, 8th May, 1832.

Gentlemen,—Please to pay Adam & John Miller or order, four hundred and twenty-one dollars, with interest from 13th April, 1832, and deduct the same from the amount due me from the estate of the late J. T. Chase, and much oblige yours, &c.

F. T. LOCKERMAN.

To Messrs. R. M. C. and R. I. C., executors of J. T. C., and sought payment from the executors of J. T. C.

The defendants were summoned, and on the 5th September, 1833, the complainants obtained an interlocutory decree for want of an appearance, and a commission to take proof in support of their claim.

At the same term R. L. and F. T. L. filed their answer by consent, disclaiming all knowledge of the single bill as alleg ed by the complainants; but admitting that R. L. was in pos-session of a single bill of J. T. C., for bank stock by him borrowed of F. T. L. for $1350, payable to R. L. jr., for the use of his mother F. T. L.; that R. L., was the administrator of R. L. jr. The answer admitted that F. T. L. was indebted to the complainants for goods sold to her, on her separate ac-count, and that she executed the order filed with the bill, to satisfy their claim.

The executors of J. T. C. also answered the bill, admitting the execution of some instrument by their testator to R. L. jr. for the benefit of his mother, of which they asked an inspec-tion; also notice of the assignment to the complainants from F. T. L., but they had declined to admit its validity, unless established by decree of this court: assets were not admitted but the executors offered to account as the court should direct; that the residue of the estate of their testator, and the fund specifically appropriated by him for the payment of debts, were inadequate to that object; that the property specifically be-queathed by J. T. C. to his children and grand-children, had been necessarily applied to the payment of debts; that the pro-perty left to F. T. L. had not been so applied nor any part thereof; that all the devisees and legatees are bound to con-tribute rateably to the payment of his debts; and they submit

they may set off against the aforesaid claim of the said *F. T. L.* and against the claim of the complainants as her assignees, such sum as on taking of the account, it may appear she ought to contribute towards payment of the testator's debts.

After general replication, a commission was issued by consent; under it were filed copies of the administration accounts of *J. T. C.*; inventories, accounts of sales, &c.; copy of single bill of *J. T. C.* for $1350; for bank stock payable to *R. L. jr.* for the use of his mother *F. T. L.*, and also the will of *J. T. Chase*, contains the following devises, to wit:

"I will and direct all my just debts to be paid. I give and devise to my dear son *Richard M. Chase*, his heirs and assigns, all those several tracts and parcels of land lying in *A. A.* county and included, &c., and also the lots, grounds and houses in the *city of A.*, which I purchased of *N. P.*, to have and to hold in fee in trust, to permit my dear daughter *Frances T. Lockerman*, during her natural life, to use and occupy the same or any part, &c. But in case my said daughter should elect, that the said land, &c., should be leased or rented out, and should signify her said election in writing, to my said son, his heirs or assigns, that then the same shall be leased accordingly—rents to be for her sole use, &c. &c.

"I will and devise unto my son *R. M. C.*, his heirs, executors, &c., all the lands mortgaged me by my son son-in-law *Richard Lockerman*, in trust, to receive the interest on said mortgages, which has or may become due, and to pay the same over to my daughter *F. T. L.*, during her life; to her sole and exclusive use, &c.; and in case my son-in-law *R. L.* should survive my said daughter *F. T. L.*, I do hereby grant permission to my said son-in-law, to occupy and use the said lands mortgaged by him during his natural life, free from rent and interest.

"I give and devise the lands mortgaged to me by my son-in *R. L.* after his death, and after the death of his wife, unto their children and their heirs, to be equally divided amongst them. My will is, that after the death of my dear daughter *F. T. L.*, my son *R. M. C.*, his, &c., by a good and sufficient deed,

shall convey the said lands lying on *Fishing Creek*, *Smith's Creek* and *South River*, and the lots of ground and houses in *Annapolis*, hereinbefore described and devised to him in trust, unto the children of my daughter *F. T. L.*, their heirs and assigns, equally to be divided among them.

"I give and devise unto my said daughter *Hester Ann*, and the heirs of her body lawfully begotten, all the rest of my lands lying on *Oyster* and *Fishing Creeks*, *South River*, and the *Bay*, including *Thomas' Point*, and adjoining the lands devised unto my daughter *Lockerman*.

"I give and devise unto my son *Richard M. Chase*, all that part of *Belmont*, (according to the re-survey thereof,) which is included within, &c., to have and to hold the said land to the said *Richard M. Chase*, his heirs and assigns forever, in trust— to permit my dear daughter *Matilda Chase*, and her husband *Thomas Chase*, during their natural lives, and the natural life of the survivor, to use and occupy the same, and receive the profits and rents, &c., with a right to make leases; and after the death of his daughter and son, in trust for the use of the children of my said daughter, their heirs and assigns, equally to be divided among them.

"I give and devise unto my son *Richard M. Chase*, his heirs and assigns forever, all that part of the residue of *Belmont*, according to the re-survey thereof, not given or devised unto my dear daughter *M. C.*, to have and to hold to him, his heirs and assigns forever.

"I give and devise unto my dear daughter *Hester Ann*, during her life, my dwelling house and the lots appertaining to it, and all my household and kitchen furniture.

"I give and bequeath unto *H. A.*, my dear daughter during her life, all the rents now due, or which may become due on the lots of ground I leased to *Vachel Dorsey*, and forever—one-fifth part of my plate.

"I give and bequeath unto my grand children, the children of my daughter *Lockerman*, one-fifth part of my plate, same to my grand children, children of *M. C.*—same to my son *R. M. C.*—same to my daughter *C. C.*

"I give and bequeath unto the children of my daughter *Lock-*erman, all the plate I bought of my son-in-law *R. Lockerman.*

"I give and devise unto my daughter *H. A.*, sixty shares of the stock of the *Farmer's Bank*, forever.

"I give and devise unto *R. M. C.*, his heirs and assigns, the two half acre lots in *Annapolis*, now occupied, &c.,—all my notes, note books, family pictures, watch and sleeve buttons.

"I give and bequeath unto each of my grand children, two shares of stock in, &c.

"I give and bequeath unto my dear son *R. M. C.*, the following negroes, to wit, &c.—to my grand children, certain slaves, &c.; and having advanced my dear daughter *C. C.*, in addition thereto, I give her certain slaves—also, to *A. H.* certain slaves, to serve until, &c.·

"It is my will and desire, that all my negroes and mulattoes be free, as follows, that is to say, &c.

"I give and devise unto all my grand children, after the death of my daughter *H. A.*, the ground lying in *Baltimore* county, which I leased to *V. D.*, to them and their heirs, to be equally divided among them.

"Having endeavoured in the best manner to equalize the respective portions given to my children by advancement, and the particular devises in my will, it is my most earnest desire and request, that my children be satisfied and contented with the distribution I have made, for I can truly assure them, that in so doing, I have been prompted by the same affection for each, &c."

After providing for the payment of a debt of his son *Thomas*, by authorising a sale of certain real property, and making sundry small legacies, the will declared as follows:

"All the rest and residue of my estate, real, personal and mixed, or of whatever nature and kind, I give, devise and bequeath unto all my dear children and their heirs, equally to be divided among them. It is my will and desire, and I do direct my executors, that all the personal estate devised to my dear daughters under the residuary clause of my will, be converted into money, by my executors, and invested in stock of

*The United States, &c.*, and that the dividends and interest be received by my executors, and paid over to my daughters respectively, as entitled, and that the stock be sold, and principal received, whenever my daughters or either of them should request it, and paid to them for their exclusive use and benefit. In case my personal estate, and the land appropriated to the payment of my debts and legacies should be insufficient for the said purpose, I will and direct, that the deficiency be applied out of the residue of my estate, as my executors may think it right." And then appointed *R. M. Chase* and *R. I. Crabb*, executors.

The *first* codicil of 7th May 1824, devised his dwelling house and ground to *R. M. C.* after the death of *H. A.*, and certain shares of bank stock to several of his grand children, intended for them by their grand mother, and certain household and kitchen furniture, plate excepted, to *H. A.* for life.

The *second* codicil dated 31st May 1824, substituted pecuniary legacies to *H. A.*, $3000, and several of his grand children, $250 to some, $100 to others, for the stock previously bequeathed to them, and ordered his executors to sell a portion of the residuum of his estate, real and personal, as would enable them to comply with this bequest, with power to convey the real estate.

The *third* codicil of 5th September 1825, contained directions, as to delivery of his negroes to his legatees, and sales of crop on hand and cattle, for payment of debts and legacies; a revocation of power to sell certain property for payment of his son *Thomas'* debt, he having paid that debt—and further devises of real property to certain of his grand children; provision by the sale of real property to pay *Mrs. Lockerman's* debts, and power to her to convey, &c.

The *fourth* codicil without date, contained devises of real property to his children and grand children, by name.

The *fifth* codicil of the 29th November 1825, contained directions to his executors to comply with his contracts for sale of real property, and execute conveyances to the purchasers thereof, and then proceeded—

"It is my will and desire, and I do direct, that my execu-
tors, out of the money annually receivable, and to be received
by them under the decree of the Chancery Court, in the case
of *Joseph Sterett* and *Molly* his wife and *Jeremiah Townley
Chase* against *Thomas Moale* and others, apply so much of the
money to be received by them annually, out of the part or
portion of the money allotted to the said *J. T. C.*, by virtue of
the said decree, as shall or may be sufficient for the payment
of the taxes on the real estate of the said *J. T. C.* lying, &c.,
during the minority of the youngest child of *F. T. L.* and *M.
C.*, whichever event may be most distant from the time of my
death, and the residue of the money annually received under
said decree, to be equally divided among my children, share
and share alike, and paid to each of them for the use of their
respective children, and by each of them so applied."

The *sixth* codicil devised a part of *Belmont*, as discribed, to
his daughter *M. C.*, to have and to hold to her, and the heirs of
her body, and to *M. C.* and *H. A.* during their lives, or the life
of the survivor of them, his dwelling house in *A.*, and after
the death, &c., "to the children of my daughters *M., H. A.*
and *F.* and their heirs as tenants in common.    I give and be-
queath unto my said daughters, all my kitchen and household
furniture, my plate excepted, during, &c.

"I give and devise unto my daughters *M.* and *H. A.* part
of the Plains I bought of *R. I. C.* during, &c., and after unto
the children of my daughter *M.* and their heirs, to be equally
divided among them."

"I hereby revoke the devise of part of the *Plains* to my
daughter *H. A.*, and substitute the above clause in the place
of it.

"I hereby revoke and annul that part of my will by which
I devise to each of my grand children, two shares in the *Far-
mer's Bank of Maryland*, from an apprehension that my ex-
ecutors will not have sufficient funds to comply with it; and
also, that clause in my will by which I bequeath sixty shares
of stock in the *F. B.* to my daughter *H. A.*, and lieu thereof,
I give and devise to her all my right, title and interest in twen-

ty-one acres of land, which I leased to *Vachel Dorsey,* now deceased."

Judgments against *J. T. C.* were also filed, with various admissions as to couse of the executors with the personal property.   After this bill was amended upon petition, and all the heirs and devisces of *J. T. C.* made parties as defendants, the defendants answered this bill, taking different views of the will of *J. T. C.,* when at October 1835, the cause was referred generally to the auditor of the court to report upon. After various admissions of facts and ages of children, &c., the auditor made his report, which was excepted to, and on the 3rd December 1836, The Chancellor (Bland,) passed the following order:

"Ordered, that this case be, and the same is hereby again referred to the said *T. C.* as special auditor.

"It is to be recollected, that under one of the codicils to the will of the testator *J. T. C.,* deceased, his children take the money to be received under the decree in the case of *Sterett* and *Chase* against *Moale and others,* as naked trustees, for the use of his grand children, and that after the death of all the children of the testator, that money is to be divided only into so many parts as it shall then appear there were children of the testator, who have then left children, and each of such parts, as if carried by representation to such grand children, is to be then finally divided among and given to them accordingly; or in other words, that money then vests in, and is to be divided among his grand children, as if he had died intestate, leaving no other children, than the parents of his then living grand children, which children were also then dead intestate.   Whence it necessarily follows, from the language of the same codicil, in relation to the application of so much of that money to be received annually, that until the death of the survivor of the testator's children, all those portions of the said money, as they annually become payable, after deducting therefrom, during the minority of the youngest child of the testator's daughter *Frances T. Lockerman,* or of his daughter *Matilda Chase,*

so much as may be necessary to pay the taxes on the testator's real estate, lying in *Anne Arundel* county, and in the cities of *Annapolis* and *Baltimore*, and to be considered as then annually vesting in the testator's grand children, in like manner and in the same proportions as if his children were all then dead; so that as an additional grand child may be born before the death of all his children, a new use springs up in favor of such additional grand child; and all the then existing uses shift so far as may be necessary to accommodate such new claim. And so too on the death of a grand child, before the death of all his children, the claim of such deceased grand child, not then vested, sinks for the benefit of the others, and the uses shift accordingly, so that a dividend of the annual portion only of the said money, is to be considered as so vesting in each grand child, who was alive when it became payable before the death of all the children of the testator. The exact amount due as well to the defendant *F. T. Lockerman*, as to the plaintiffs, as creditors of the testator is to be ascertained, and also the amount of assets in the hands of the executors, and then the proportion in which each devisee and legatee under the will and codicil of the testator, is to contribute to the payment of the said debt, is to be adjudged from the proofs and admissions of the parties, according to the value of the respective beneficial interests so devised or bequeathed.

At April 1837, the auditor made another report, with voluminous accounts; and at December term following, the parties agreed, that the accounts and report should be rejected by the Chancellor, and that the cause be remanded to the auditor with directions, to state an account upon such principles of contribution as the Chancellor may deem correct, according to the proceedings and this agreement, viz:

"It is admitted, that *J. T. C.*, advanced his daughter, the defendant *Catharine Crabb*, by a conveyance of real estate to the said *Catharine* and her husband, *R. I. Crabb*; that he advanced several of his children parties defendants in this cause, by gifts or otherwise, of personal property, and by money paid by him on their account, as stated in the said will, but the

value or amount or particulars of such advancements, are not yet ascertained, otherwise than as stated in the said will.

If the Chancellor shall be of opinion, that upon the whole of the said testator's last will and testament, and the proceedings in this cause, his several children or their representatives are bound to contribute equally to pay his debts, which remain unsatisfied, after applying the general residue of the estate to that purpose, then the auditor shall cause the said five children, or their representatives, equally to contribute, when the case is remanded to him.

But if the Chancellor should decide, that the said five children or their representatives, are not so bound equally to contribute, then the Chancellor is respectfully requested to express his opinion in regard to the liability of—

1st. The testator's personal estate, specifically bequeathed by his will.

2nd. The personal estate advanced by him in his life time to his children, or paid by him on their account, as stated in his will.

3rd. The real estate devised by him to his children.

4th. The real estate advanced by him in his life time to *Catharine Crabb.*

5th. The interest of the said testator in the estate mortgaged by *Richard Lockerman* deceased to him, as will appear by the decree, and other proceedings of this court.

6th. The testator's claim against the fund raised or to be raised, under the decree of this court in the cause of *Sterett vs. Moale,* to contribute to the payment of his debts aforesaid, and the order or degree in which the said descriptions of property or such of them, as shall be held liable, ought to contribute to the purpose aforesaid.

"It is further agreed, that the Chancellor may at once pass a decree for the payment of the complainant's claim, the executors having money in hand sufficient to pay the same, provided that such decree shall not prejudice the question of contribution as aforesaid."

Upon this agreement the Chancellor (BLAND,) passed an

order for payment of the complainant's claim, and on the 4th May 1838, the following order:

"Ordered, that the report of the special auditor, filed on the 4th April 1837, be and the same is hereby rejected; and it is hereby further ordered, that this case be and the same is hereby again referred to the said special auditor, with directions to state an account awarding to the several parties, that to which they may be respectively entitled, and charging each of the five devisees and legatees of the testator *J. T. C.* deceased, with an equal contribution for the satisfaction of his debts.    All the estate of a debtor being liable for the payment of all his debts, he cannot by any act of his, impair the rights of his creditors. The testator *Chase,* indicates by his will, that he was then disposing of his property with a full view of this legal restriction, and taking his will and his several codicils together, it was manifestly his intention, subject to the legal restriction in favour of his creditors, that all his property, without regard to its being real or personal estate, should be equally divided in the manner prescribed, among the five special objects of his bounty.    And the property having so passed into their hands; for they all claim under, and in affirmance of his will, they must therefore each of them contribute in the same equal proportions, to the satisfaction of such of his debts as remain unpaid; so as to leave the property to pass in the same proportional value to each donee as adjusted by the testator.    The persons who may be required to refund any of the proceeds which had been obtained under the decree in the case of *Sterett and others vs. Moale and others,* and which had been applied under the sanction of an order of the orphans' court, are not to be charged with interest thereon.    The special auditor will also recollect, that the order of the 3rd December 1836, and of the 5th December 1837, are to be construed in accordance with this order."

Further accounts were reported, and excepted to.    The cause by consent was then submitted for an immediate decision, and the accounts ratified.  No question however was made upon those accounts in this appeal.  The parties then filed the following agreement:

It is agreed, that the whole cause shall be treated as opened upon appeal; so as to enable the Court of Appeals to affirm, reverse or modify the orders passed in the cause for or against all or any of the parties, in the same manner and to the like extent, as if separate appeals had been taken by each party, and as if each appeal had been taken from all of said orders.

The cause was argued before STEPHEN, ARCHER, and DORSEY, J.

T. S. ALEXANDER for appellants.

1st. Upon the true construction of the will of *J. T. C.*, the fund to be derived from the decree passed in the case of *Sterett vs. Moale*, ought to be distributed among all the children of the testator. This fund passed to all the children as a part of the general residuum of the estate. The division is to be made among the children, share and share alike. Payment is to be made to each child, and the application of the fund is thrown on his children. The executors are not bound to see to the application of this fund among the grand children. If not bound to apply, then they are not bound to inquire into the existence of grand children. They are bound to pay this fund to the children; this is their duty and the extent of their obligation. The court cannot go beyond the will; must construe that and no more. A court of equity cannot impose any further duty on the executor, than is imposed by the will. The bequest is to children; the distribution is among them. Is there any use which can be executed by any court? The fund is left to the *discretion* of the children. They are not required to distribute it *equally*, even among the grand children. Each child of testator may apply all its share to any one grand child, unequally or exclusively. No declaration as to time of application. It may be retained for future use. It is independant of all trust to grand children. If a trust, it must be indefinite in duration—for life of parent or longer. In effect, it is not a condition, which can be specifically executed. Whether issue now is not material. There may be issue. The Chancellor said, as no issue now they may be excluded. But I

contend, that if any one child should lose all her children, still she would take. She would answer the description of the will at death of testator. The fund is to be paid over to the children, although there is a trust in favor of grand children. 3 *Bro. C. C.* 96.

As a general rule, the reason of a bequest does not control its construction, the construction of its terms. 14 *Ves.* 322. 16 *Ves.* 46. *Pre. in Chan.* 597. 2 *Con. Cas.* 223.

A devise to a father for the maintenance of his child, is a devise to the father, though he has not expended one half of the bequest. 1 *Swan.* 35.

2nd. Contribution for the payment of the testator's debts, ought to be made by his legatees and devisees, according to the character and value of the property given to them respectively by his will, and not equally by his children, as to the principles on which contribution is to be decreed. The estate is exhausted unequally. It depends on the value of the property devised. It does not include the advances by the parent. At the time of making the will, the testator had no control over the property advanced to his children. Contribution does not affect advances. In cases of intestacy, advances are not considered in payment of debts; as to *distribution*, advances may be considered. But this is optional with the party advanced. Hotch-pot applies to intestacy. Testator may prescribe terms; impose terms. The law does not impose terms.

For payment of debts, the estate of the intestate is to be applied in the following order—

1st. The general personal estate.

2nd. Personal estate specifically bequeathed.

3rd. Real estate not specifically devised.

4th. Real estate specifically devised.

5th. That the debt secured by the mortgage of *Richard Lockerman* to the testator, is to be treated as personal estate. 3 *John. C. Rep.* 319.

RANDALL for the appellees, contended—

1st. That according to the true construction of *J. T. Chase's*

will, the fund to be derived from the case of *Sterett vs. Moale,* belongs exclusively to those of the children of *J. T. C.* who have children, and in trust for such children.

An examination of the different parts of his will, shows the general intention of the testator. He designed a fund for the exclusive use of his grand children. He creates such a fund. It is absorbed; then he provides another fund for the same object. The utmost anxiety is manifested to devote to his grand children a certain portion of his estate. This he particularly and clearly designed. If it is not illegal, that intention will be carried out. The will devises a large part of his estate to his grand children, and also declares equal distribution among all, to be his object in his second codicil. If there is any doubt then about the construction of the devise of the *Sterett* and *Moale* fund, the court will construe it by the general design of the testator, and make that devising clause end in that design. The codicils are framed on the principles of substitution, and the intent relied on, is some times expressly declared. The court will look to the *cestui que trusts,* and the fact of five trustees for the grand children is not material. The Chancellor was correct, and his order upon this branch of the case, meets all its fluctuating contingencies. It was a legacy for the use of grand children, born and to be born. 10 *Law Lib.* 22. *Willis on trusts,* 48. *Tolson vs. Tolson,* 10 *Gill & John.*

2nd. In opposition to the appellants second point, that the contribution for the payment of the testator's debts, ought to be equal by each of his five dhildren, without regard to the quantity or quality of the estate devised or bequeathed to them, because by the true construction of the will, it is obvious, that he has by advancement or otherwise made their share equal. 1 *P. Wms.* 403. 1 *Rop.* 254. 12 *Law Lib.* 18, 34, 19, 35. 3 *P. Wms.* 322, 324.

There can be no appraisement in this case, for the testator has devised to them equally. The nature of this will is such, that if contribution to pay debts is necessary, that must be founded upon the testator's intention that the devises are equal.

Those who take under a will are concluded by it. 2 *Rop.* 378. 2 *Wm. Exrs.* 893.

3rd. ·The executors should have been made to pay interest on the balances due by them, on their administration account. 1 *Swan.* 99.

4th. That *R. I. Crabb* and *H. A. Chase*, should be made to pay interest on the portions of the *S.* and *M.* fund received by them, and ordered to be refunded by the Chancellor.

ALEXANDER in reply as to third point cited.12—*Ves.* 386. 2 *Roper*, 336, 438, 439.

STEPHEN, J., delivered the opinion of this court.

The personal estate of the testator not being sufficient to pay his debts, and the specific legacies bequeathed by his will, the question arises, in what manner the deficiency is to be supplied, or upon what principles, contribution is to be made by those who have been the objects of his bounty in the disposition of his property. By his will, he has given several specific legacies, and devised to several of his children a considerable real estate, and the question which it becomes necessary to decide, is whether the devisees of real estate, are to contribute equally and proportionally with the specific legatees of the personalty, or the burthen of making up the deficiency, is to fall solely, and exclusively, upon those, to whom he has specifically bequeathed a part of his personal estate.

The principle seems to be well settled in *England*, that as to debts by specialty, since the *statute of fraudulent devises*, making real estate in the hands of devisees, liable to the payment of such debts, specific devisees of free hold, and lease hold estate, are on the same footing; and liable to contribute in equal proportions to the satisfaction of those debts. It was so decided in the case of *Short vs. Long*, 2 *Vernon*, 756. In that case the assets falling short to pay debts, the question was, whether the deficiency was to be charged upon the real or upon the lease hold estate. The *Lord Chancellor* decreed the deficiency to be borne equally, in proportion to value of each estate. The debts being due by specialty, and both de-

scriptions of property liable for the payment of them; and the devisees and legatees being both equally objects of the testa-tor's bounty, he determined that the contribution ought to be equal.

The same case is to be found reported 1st P. Will. 403, 404, Lord Chancellor Cowper, that great master of equity, as he has been emphatically styled, there decided, that to prevent the disappointment of the testator's intention, both estates being liable, the contribution ought to be equal.

The counsel for the appellant in the course of his argument, seemed to think, that this decision had been overruled in the case of Hazlewood vs. Pope, 2 P. Wms. 322. In 1st Roper on Leg. 638, it is said, the fifth resolution in Hazlewood vs. Pope, may probably at first sight, be considered at variance with the case last cited. That resolution was in these words, "where a man dies indebted by bond, and leaves a personal estate, and devises lands to J. S. in fee, and gives specific legacies, and the creditor by bond, comes on the personal es-tate to be paid his bond, the specific legatees shall not stand in the place of the bond creditor, to charge the land devised; because the devisee of the land, is as much a specific devisee, as the legatee of the specific legacy." It is presumed, says Roper, that Lord Talbot, in the expression, "the specific leg-atees shall not stand in the place of the bond creditors, to charge the land devised," must have intended, not that the devisee should not contribute, but that the specific legatee had no right to have the assets marshalled against the specific de-visee, so as to throw the bond debt exclusively upon the real estate devised, to the exoneration of the personalty, specifi-cally bequeathed. In this qualified sense, the resolution in question, and the case of Long vs. Short, probably may be reconciled; but the point cannot be considered free from doubt. The reason assigned by Lord Talbot, would seem to indicate, that the construction given by Roper to his opinion was well founded, and that he did not intend to repudiate the principle of contribution, but only designed to exclude the doctrine of an exclusive liability, under the circumstances attaching to the

devisee of the real estate.    It was manifestly the opinion of
*Roper*, that the principle of contribution was sustainable, be-
cause in the preceding page, he says, "there appears to be a
distinction, in the application of the preceding rule, as to mar-
shalling in favor of specific legatees, for in that case it seems,
that the real and personal assets specifically devised and be-
queathed, will upon failure of the general personal estate, be
so far marshalled, (if indeed that term can in strictness be ap-
plicable,) that the specific devisee and legatee, shall each, in
proportion to the value of their respective gifts, contribute to
the payment of the specialty debt.    But with respect to a sim-
ple contract creditor, the exception is not admitted; for he
must resort alone to the personal estate specifically bequeathed,
as that is the only fund liable to his debt."

The principle established by Lord *Chancellor Cowper*, in the
case of *Long vs. Short*, is sanctioned in a note, to be found in
3 *Woodeson's Lect.* 534, where it is said, "as to debts by spe-
cialty, specific devisees of freehold, and leasehold estates,
seem to be on the same footing, since the *statute of fraudu-
lent devises*, 3 *W.* and *M. ch.* 14, and liable to contribute in
equal proportions to the satisfaction of those debts."    So also
in 2 *Wms. on Exrs.* 1043, in a note, it is said, "according to the
decision of *Ld. Cowper, in Long vs. Short*, 1*st P. Wms.* 403,
the devisee *would* be entitled to compel the specific legatees to
contribute to the payment of the debt, but not wholly to ex-
onerate the land."    Again, at page 1056, of the same book, in
a note, it is said, "with respect indeed to specific legacies, the
assets, according to *Ld. Cowper's* decision in case of *Long vs.
Short*, shall be so far marshalled upon failure of the general
personal estate, that the devisee, and specific legatee, shall
each in proportion to the value of their respective gifts, con-
tribute to the payment of the specialty debt."    In 3 *John C.
Rep.* 158, speaking upon the subject of contribution between
two specific devisees of land, *Chan. Kent* says, "the same rule
was declared in *Long vs. Short*, 1 *P. Wms.* 403, in the case of
two specific devisees of land.    The *Lord Chancellor* said it
*would* equally disappoint the intention of the testator, to de-

feat either devise, by subjecting it to the testator's debts; and therefore he held, that on a deficiency of assets, both estates must contribute in proportion to the value of their respective premises."

In *England* as in this *State*, the personal estate is the natural or primary fund for the payment of debts, as between the real and personal representatives of the deceased, and must be resorted to in the first instance for that purpose. And in order to inforce such primary liability, it is an established rule in equity, that as between the representatives of the deceased debtor, if the creditor proceeds against the real estate, descended or devised, the heir or devisee, who has sustained the loss, shall be allowed to stand in the place of the specialty creditor, to re-imburse himself, out of the personal estate, in the hands of the executors, provided such re-imbursement will not prejudice *any of the creditors, or any other party having a more favored claim*, than the heir or devisee respectively. *Wms. on Exrs.* 1041.

If the obligee recovers against the heir, he may re-imburse himself out of the assets in the hands of the executor, but not to the prejudice of either a specific or general legatee; such an equity exists only in favor of the heir, against a residuary legatee, but in favor of a devisee, it exists against a general legatee, though not as it *would* seem against specific legatees, for the reason heretofore given. 2 *Wms. on Exrs.* 1043.

According to the principles of the *English* law, equity will marshall the real assets descended to the heir, in favor of, or for the relief of specific legatees; but it will not for such purpose interfere with the lands devised, unless they were devised subject to the payment of debts. 3 *John. C. Rep.* 153. That is to say, the lands devised, will not be made to release or exonerate the specific legatee, but they will be held *to contribute*. The general rule of marshalling assets, is to apply, first the personal estate; then lands devised to be sold for the payment of debts; then lands descended; and *lastly*, estates specifically devised, even though they are generally charged with the payment of debts. The testator in this case, having made

provision in his will for the payment of his debts and lega-
cies, if the fund provided by him for that purpose has proved
to be inadequate, the rule of contribution, as established by
law, must be resorted to, and ought to prevail.

We therefore think, that if in course of the administration
of the assets by the executors, the specific legacies bequeath-
ed by the will of the testator, have been applied to the pay-
ment of specialty debts, the specific legatees are entitled to
contribution against the devisees of the real estate; but that
so far as such legacies may have been applied to extinguish-
ment of the claims of simple contract creditors, no such right
of contribution exists, as against the devisees of the realty;
the personal fund alone being responsible for the payment of
debts of that description.   We think moreover, that if the
general personal estate has been applied to the payment of the
specialty debts, whereby the simple contract creditors, have
been thrown upon the specific bequests, the specific legatees
have a right to resort to the devisees of the real estate for con-
tribution; such right of contribution being essential to carry
into effect the intention of the testator, which was to make
them both equally the objects of his bounty.   The property
given by him in his life time to his children by way of ad-
vancement, was no part of his estate at the time of his death,
and cannot be made to contribute by his representatives to the
payment of his debts.

We are of opinion, that the money receivable under the de-
cree in Chancery in the case of *Sterett vs. Moale,* ought to be
equally divided amongst all the children of the testator, and
not exclusively given to those having children.   The will of
the testator affords pregnant evidence, that all his children
were equally the objects of his bounty and affection; and in
disposing of the fund in question, the language he has used
is strong to shew, that an equal participation by them in the
benefits of that fund, was his object.   It is true, that at the
time his will was made, and at the period of his death, there
were two of his children who had no issue; but in the course
of nature, it was not improbable that, that state of things

might cease to exist; and in the event of their having children, the same motive and feeling of parental affection, would have operated in their behalf, and *would* have made them equally the objects of his bounty and benevolence. The language of his will in reference to the subject is as follows: "the residue of the money annually received by my executors under the said decree, to be equally divided by them, amongst my children, share and share alike, and paid to each of them for the use of their respective children, and by each of them so applied."

From the terms of this bequest it is, we think, most apparent, that equality to each of his children, was the governing motive of the testator, and such ought to be the construction given to his will, if it can be made compatible with the import of the language he has used. Where the testator stands in the relation of parent, a bequest to children generally will be presumed, in legal construction, to embrace all who answered that description at the period of his death. A court of equity is always solicitous to adopt and enforce such a construction, because it is conformable to the dictates of nature, and in accordance with the best affections of the heart. In 2 *Wms. on Exrs.* 716, speaking of bequests to children in a class, the author says, "generally speaking, every person who at the time of the testator's death falls within the described class of children, will be entitled. But where it appears from express declaration or clear inference upon the will, that the testator intended to confine his bequest to those only who answered the description at the date of the instrument, such intention must be carried into effect. A court of equity however, is always anxious to include all children in existence at the time of the death of the testator, and particularly, when he stands in the relation of parent to the legatees; the court presuming, that he intended to do his duty, in providing for all his children at his death, will lay hold of any general expression, to give effect to this presumed intention, and will not permit such general expression to be narrowed by the context." The language of the will, in making the bequest in this case, is very

broad and general.   The legacy was to be divided by the ex-
ecutors amongst his children, share and share alike; and paid
to each of them, for the use of their respective children, and
by each of them so applied.   It is a well established rule in
the construction of wills, that where there is a general and par-
ticular intent, apparent upon the face, the general intent,
although first expressed, shall control and overrule the particu-
lar.   Thus in 2 *Wms. on Exrs.* 714, it is said, "it must not
however be understood, that because the testator uses in one
part of his will, words having a clear meaning in law, and in
another part, words inconsistent with the former, that the first
words are to be cancelled or overthrown.   A contrary princi-
ple is now fully established, in the doctrine already consider-
ed, that the general intent although first expressed, shall over-
rule the particular."   It appears in this case most clearly from
his own explicit declarations, that it was his great and lead-
ing object to make an equal distribution of his property amongst
all his children, being governed in this last solemn act of his
life, in providing for his family, and disposing of his estate by
an equal and similar affection for each, and every one of them.
If then equality of *bounty* to all his children, was his great
leading and cardinal motive; in the language of the books, if
such was his general intent, and he has used language suffi-
ciently strong to carry that intent into effect, upon principle, it
appears to be settled, that such general intent is not to be frus-
trated, by any inconsistent particular intent, but must be sup-
ported, and ultimately prevail.   In the decision of this ques-
tion, it is moreover a circumstance entitled to great and weigh-
ty consideration, that the fund in controversy is of considera-
ble value, and amounts in magnitude to nearly a third of his
personal estate; and if allotted exclusively to such of the
children of the testator as had children, will necessarily lead to
an infringement of that well established rule of construction,
that the particular must yield to the general intent, in case there
should exist a conflict between them.   Although a provision
for his grand-children might have been an object, about which
he was solicitous, it is fully apparent that he was equally

anxious, that *all* his children *should* be equally benefitted by his bounty; and that *no* distinction or disparity should exist between them, as the objects of his munificence.

The true construction of his will is, that the fund to be received by his executors, under the decree in Chancery, was to be paid to each of his children in equal proportions, to be applied by those then having issue, to the use of their children, and by those not then having children, to the use of their children, whenever they should have children. By no other appropriation of that fund, can the general intent of the testator, as plainly indicated upon the face of his will, be carried fully into effect. A contrary construction *would* defeat entirely that equality of bounty amongst his children, which appears to have been the great and paramount object of the testator in the disposition of his property, and ought not to be adopted, unless the language of his will is so explicitly imperative, as necessarily to demand it. We do not think that the executors are properly chargeable with interest upon the several balances from time to time found to be in their hands, in the course of their administration. They do not appear to have used the assets in any instance for their own emolument, nor was there that degree of unwarrantable negligence in the appropriation of them, to the payment of debts, which *would* render them upon principle so chargeable. Their settlements appear to have been annually made with the orphans' court, except in one instance, where there appears to have been an excess of a few months only; and the rule as settled by this court, appears to be, to look with a favorable eye upon the conduct of executors, and other trustees, and to treat them with a reasonable indulgence, when they have acted with good faith in the execution of the trust confided to them; and *not* to hold them liable upon slight grounds. In 4 *Gill & John. Rep.* 460, this court lay down the general principle to be, that whenever an administrator manifestly intends fairly to do his duty, the rule *should* be, not to hold him liable upon slight grounds. It is moreover to be remembered, that until the settlement of their *fourth* account with the orphans' court, the balances against

them to more than one-third of their amount, were composed in part of *Bank of Columbia* stock, for which in that account, they obtained a credit, as being worth nothing.    In the book last referred to, it is true, this court say, an administrator may be compelled to pay interest on money kept in his hands, without apparent reason, from the end of thirteen months after the the date of his letters, but they say at the same time, that he is only to be charged with interest, where in so doing, it also appears that he is guilty of a culpable inattention to his duty. In this case, so far from being guilty of negligence, or a culpable inattention to duty, the executors appear in one instance, to have used extraordinary diligence and dispatch; for their third and fourth accounts, from the dates of the probates attached to them, appear to have been settled with the orphans' court on the same day.

In treating upon the subject of charging executors or administrators with interest, in the settlement of their accounts, *Wms. on Exrs.* 1132, says, "There are two grounds on which an executor or administrator may be charged with interest: 1st. That he has been guilty of negligence in omitting to lay out the money for the benefit of the estate.    2nd. That he himself has made use of the money to his own profit and advantage, or has committed some other misfeasance.    With respect to neglect on the part of the executors, in not laying out balances, it must be observed, that it frequently may be necessary and justifiable, for an executor to keep large sums in his hands, to answer the exigency of the testator's affairs, especially in the course of the first year after the decease of the testator, in which case such necessity is so fully acknowledged, that according to the ordinary course of the court, the fund is not considered distributable until after that time.    But if the court observes, that an executor keeps money dead in his hands, without any apparent reason or necessity, then it becomes negligence, and a breach of trust, and the court will charge the executors with interest."    So in 3 *Gill and John.* 341, this court say, where trustees act *bona fide* and with due diligence, they have always received the favour and protection of courts

of equity; their acts have been regarded with the most indulgent consideration. Under the circumstances of this case, we do not therefore think, that there has been such negligence and culpable inattention to duty, as to require, that the executors should be charged with interest on the balances, from time to time, found to be in their hands. It does not appear, that the assets have been used for their own benefit, or that any unreasonable or avoidable delay, has occurred in bringing their trust to a final settlement.

We think, that the bequest to his children of the money to be received under the decree in Chancery, was a specific legacy, and not liable to abate with the general legacies. The money to be received under that particular decree, was given to the legatees; and they had a right to demand it, as such from the executors. The intent was clear, to give that identical money, and not a sum of the like amount generally. When received by the executors, it became specifically the right and property of the legatees, and they had a right to demand it of the executors as such. In 2 *Wms. on Exrs.* 745, it is said, "where the bequest was to my grand-daughter, the sum of forty pounds, being part of a debt due to me, from A, for rent, she allowing what charges shall be expended in getting the same. *Item*—I bequeath to my grand-sons C. and D., the rest and residue of what is due to me from the said A, which is about forty-pounds more, in equal shares, and they allowing charges as aforesaid, these were held specific legacies." Again, at page 739, the same author says, "a legacy is general, when it is so given as not to amount to a bequest of a particular thing, or money of testator, distinguished from all others of the same kind. A legacy is specific when it is a bequest of a specific part of the testator's personal estate, which is so distinguished." A debt due to the testator, may be specifically bequeathed; as where there is a bequest of the money now owing to me from A, or the money due to me on the bond of A. That the legacies were specific, will further appear from the consideration, that if the fund had failed out of which they were payable, the legatees would not have

been entitled to any recompense or satisfaction out of the general personal estate, which is one of the features distinguishing a general from a specific legacy.

As to the character of the mortgage from *Richard Lockerman* to the testator, and whether the same is to be considered as real or personal estate, we are of opinion, that it must be considered as belonging to the class of real, and *not* personal assets.     There is no doubt of the general rule, that a mortgage interest before foreclosure, is considered in equity, as a chattel interest, and personal assets, and belongs to the executors; and though the technical fee may descend to the heir, he takes it in trust for the personal representatives.     3 *John. C. Rep.* 145, and cases there cited.     The principle is well settled, that a mortgage on lands is nothing more than a security for the debt, and any thing which transfers or extinguishes the debt, transfers or discharges the mortgage as an incident to the debt.     This no doubt is the general aspect under which it is viewed in a court of equity; but it is equally well settled, that the mortgagee, may as between his real and personal representative, by a manifest declaration of his intent, convert the mortgage, as well as any other part of his personal estate, into land; and make it pass accordingly.     1 *Wms. on Exrs.* 432. 2 *Vernon,* 581.

In the case referred to in *Vernon,* the following facts are stated: "the testator having several mortgages, and amongst the rest, a mortgage in fee of lands in *Fenlake,* he devises his mortgages to his two daughters, and their executors and administrators; and devises his lands in *Fenlake,* upon which he had entered, upon forfeiture of the mortgage, to his two daughters and their heirs; *Mary,* one of the daughters, dying without issue, *Higgs* the husband and administrator, claims a moiety of the lands in *Fenlake,* as part of his wife's personal estate, it being a mortgage not foreclosed, nor the equity of redemption released." Upon this state of facts, the court say, "although it is a mortgage, as between the mortgagor and mortgagee, yet the testator's intent was, it should pass to his daughters as real estate, to them and their heirs, and not as

part of his personal estate; and *Mary* the wife of *Higgs*, being dead without issue, it descends, and goes to her sister, as her heir at law, and *Higgs*, as administrator to his wife, ought not to have any part thereof as personal estate." It is manifest, that the ground of the decision in this case was, that the mortgaged estate in question, was devised to his daughters, and their heirs; and not as in the case of the other mortgages, to his daughters and their executors and administrators; it being therefore the clear intent of the testator to treat it as real estate, descendible to the heirs, and not as personalty, which *should* pass to the executors or administrators, the court, in order to effectuate that intent, treated it as land, and not as personal estate. In the case before this court, the intent of the testator was we think equally apparent, to treat the mortgage as real estate, and not as personal property. The language of the will is as follows: "I will and devise unto my son *Richard M. Chase*, his heirs, executors and administrators and assigns, all the lands mortgaged me by my son-in-law *Richard Lockerman*, in trust, to receive the interest on said mortgages, which has or may become due, and to pay the same over to my daughter *Frances Townley Lockerman*, during her life, to her sole and exclusive use and benefit; and her receipt for the same, shall be good and sufficient in law, and equity; and in case my son-in-law, *Richard Lockerman*, should survive my said daughter *Frances Townley*, I do hereby grant permission to my said son-in-law to occupy and use the said lands mortgaged by him, during his natural life, free from rent and interest. I give and devise the lands mortgaged to me by my son *Richard Lockerman*, after his death, and the death of his said wife, unto their children, and their heirs, to be equally divided amongst them." The lands mortgaged in this case are devised to the trustee and his heirs, and after the death of the *cestui que trust*, and her husband, (who in case of his surviving his wife, is to have permission to occupy them free from rent and interest,) they are devised to their children and their heirs, to be equally divided between them. The intention of the testator, therefore, to treat the mortgage as real estate, is, we think,

most clear and indisputable. Upon the subject of costs, we think, that the executors ought not to be personally charged with the payment of them, either in this court, or in the court below; but that they ought to be paid out of the assets of the estate. The difficulties attending the execution of their trust, rendered it proper, that they *should* act under the direction and indemnity of a court of equity; and in such cases the practice seems to be to charge the cost of the suit, upon the fund. *1st John. C. Rep.* 45, 473, 153. In the last case referred to, the Chancellor says, as the defendant is not in default, and has only sought the direction of this court, in a case proper for it, he ought to receive cost out of the fund, and this is the course of the court in such cases. The decree of the Chancellor is reversed, and the cause remanded to the Court of Chancery for further proceedings, conformably to the principles herein contained.

DECREE REVERSED AND CAUSE REMANDED.