OSWALD T. HEMSLEY et al. *vs.* LYDIA HOLLINGS-
WORTH et als.

S. STERETT McKIM et al. *vs.* SAME.

*Wills: interpretation; "into two equal parts"; general and par-
ticular intent. Death of legatee before testator; Act of
· 1810, Chapter 34, preventing lapse; effect of subse-
quent insanity of testator; Act of 1910. Stat-
utes: construction; "shall." Retroact-
ive statutes, not favored. Partners:
liability for debts. Limita-
tions: waiver; express
promise not nec-
essary.*

A will dividing an estate into two equal parts was *held,* from
the actual terms used in the will, as well as from the general
sense, to mean "into two *equal* parts," as to *all* of the testator's
property, excepting as to certain specific personal property
specifically devised.                               pp. 436, 438   ·

Where there is a general intent and a particular intent appar-
ent upon the face of a will, the general intent, although first
expressed, controls and overrides the particular intent, if
there be conflict.                                    p. 437

Chapter 34 of the Act of 1810 provided against the lapsing of
legacies by the death of the legatee or devisee before the tes-
tatrix; Chapter 37 of the Acts of 1910 (Code, section 326
of Article 93), provides that the Act of 1810 should not apply
when a testator "shall" become insane or otherwise incom-
petent, to cancel, revoke or alter the will; *held,* that this does
not apply to cases where a testator became insane or incompe-
tent before the passage of the Act.              pp. 439, 444

The word "shall," in its common and ordinary usage, unless
. affected by qualifying words, refers to the future.     p. 442

But in remedial statutes it may be used in a general sense,
including both past and future, and should be so considered
when a more restricted sense is not required.           p. 442

Statutes which are retroactive in their effect are not favored,
even though they do not conflict with vested or other rights
guaranteed by the Constitution.                        p. 441

Where a statute is susceptible of a construction which would make it prospective rather than retroactive, especially if by the latter manifest injury may be done, it is the duty of courts to construe it to be prospective, and it should not be held to be retroactive unless its terms are such as to make that construction imperative.                          p. 441

The legatee died before the testatrix, and the firm of which he was a member was indebted to the testatrix; at the time of the death of the latter, her claim had been barred by limitations; the testatrix had become insane, after making her will, but before the passage of the Act of 1910; *held,* that the legacy passed to those entitled to it, as representatives of the legatee, free from all claim on account of the indebtedness that may have been due from him to the testatrix.      p. 444

But in the case of a legatee, the other member of the firm, who had waived the question of limitations, it was *held,* that the executors of the testatrix were entitled to apply the legacy for the payment of her claim.                          pp. 445-447

One who in a proceeding upon a petition for the adjudication in insolvency of a firm and the appointment of a receiver, alleges in the bill, to which he swore, that he is a partner, and who testifies on the witness stand that he is a partner, and that he was held out to the public as a member of the firm, and was generally known as such, was *held* to be a partner of the firm as far as the rights of creditors and his liability for the debts of the firm were concerned, although, by agreement between the parties, he was employed on a salary, and was not to receive a share of the profits until the profits should exceed an amount which, in fact, they never attained.
                                          pp. 444, 445

A member of an insolvent firm, in writing, authorized the receiver to distribute to the creditors of the firm any and all sums theretofore or thereafter paid by him to the receiver, and any and all sums theretofore or thereafter received by the receiver on his account, and especially certain amounts collected on life insurance policies, etc.; *held,* that such a paper was a sufficient acknowledgment of debts proved and allowed in the insolvency proceedings, and operated to remove the bar of the statute of limitations.                          pp. 446-447

An express promise is not necessary to remove the bar of the
statute of limitations; the acknowledgment of a subsisting
indebtedness, unaccompanied by any sufficient cause for not
paying the debt, will operate to remove the bar.        p. 446

*Decided January 17th, 1913.*

Three appeals from Circuit Court No. 2 of Baltimore City
(GORTER, J.).

The facts are stated in the opinion of the Court.

The three appeals were argued before BOYD, C. J., BRIS-
COE, BURKE, THOMAS, PATTISON, URNER and STOCKBRIDGE,
JJ.

*Eli Frank, C. Baker Clotworthy, J. Southgate Lemmon*
and *Allan McLane* (with briefs by *Lemmon & Clotworthy,*
and *Allan McLane, Eli Frank, McLane, Pegram & Frank,*
and *John L. Cornell*), for the appellants.

*German H. H. Emory* (with a brief by *J. Helmsley John-
son* and *Soper & Emory*), for the appellees.

BOYD, C. J., delivered the opinion of the Court.

Mrs. Mary Hemsley Sterett, widow of Samuel Sterett,
died on September 10th, 1911, leaving a last will and
testament which was executed on January 16, 1897, by
which she left all her estate to her executors, whom she
directed by the first clause, to pay her just debts, funeral
expenses and costs of the administration and to erect a
tombstone over her grave, and by the second clause she
directed them to divide the residue of her estate as therein
stated between those we will designate as the McKims and
the Hemsleys.   Walter Hemsley, individually, and he and
John Hemsley Johnson, executors of the will of Mrs. Ster-
ett, filed a bill in equity in Circuit Court No. 2 of Baltimore
City against those interested in the will and asked that the
Court would assume jurisdiction over the further adminis-
tration and settlement of the estate, construe the will and
direct and protect the executors in the discharge of their

duties. That Court assumed jurisdiction and determined a number of questions which are the subjects of these three appeals, the first of which was taken by the Hemsleys, the second by S. Sterett McKim and the third by Walter Hemsley, one of the plaintiffs. We will consider the various questions in the order they were passed on by the lower Court.

1. The second clause of the will gives rise to the controversy over the construction of the will. It is not divided into paragraphs, but is printed in the record as one paragraph. For convenience of reference, however, and to emphasize certain portions, we will divide it, will italicize parts of it, and will insert in brackets the numbers which do not appear in the will. It is as follows:

(1) "The residue of my estate I empower and direct my executors to divide into *two equal parts.*

(2) In the first part they are to put my interest in my house and lot on Saint Paul Street and my shares in coal companies and interest in coal mines in Schuylkill County, Pennsylvania.

(3) Into the second part *they are to put all the balance* of my estate and property except my household furniture and silverware and my articles of personal use that I may not dispose of during my life, all of which they are to divide equally among my four brothers and my nieces, Maria Kerr and Elizabeth Tilghman Hemsley, who are to take one-fifth thereof, the share of their father, Tilton Hemsley, deceased.

(4) The first mentioned of the two above described *equal parts of the residue* of my estate my executors are to assign, pay over or convey as follows: One-half thereof or *one-quarter of the residue* to my friend and cousin, Hollins McKim, and one-quarter to the following descendants of Isaac McKim, and their heirs in such manner that one-half of the said one-quarter shall go to S. Sterett McKim, who bears my husband's name, and the other half of the said one-quarter in two equal parts * * *

(5) The *remaining one-half of my estate* constituted
as above described my executors will pay over, assign
and convey as follows":

leaving one-fifth to each of her half-brothers, Oswald T. and
Walter, and three-fifths to the Safe Deposit and Trust Com-
pany in trust as therein provided for.

The important question raised as to the construction of
the above is, whether by the will the McKims only took the
interest of the testatrix in the Saint Paul street property
and in the coal companies and mines, as the Hemsleys con-
tend, or whether they took one-half of the residue of the
estate, after the payment of debts, etc., provided for in the
first clause, as the McKims claim. The question becomes
important because the Saint Paul street property and the
interest in the coal properties are together worth probably
less than a fourth of the residue of the estate. Samuel
Sterett, the husband of the testatrix, left all of his estate to
her by his will admitted to probate in 1879, and he was a
relative of the McKims, while Mrs. Sterett was a Hemsley.
No shares in coal companies were found by the executors,
but the testatrix had an interest in coal land in Schuylkill
county.

In our judgment the learned Judge below, who filed an
able and clear opinion indicating the reasons for the con-
clusions reached by him, was correct in holding that it was
the intention of the testatrix to leave the McKims one-half
and the Hemsleys the other half of the residue of her estate,
and that she did not intend to confine the McKim interest
to the Saint Paul street property and the coal companies.
She distinctly empowered and directed her executors to
divide *the residue* of her estate into two *equal* parts—not
simply into two parts. If she had intended to only leave
the McKims the Saint Paul street and coal properties, the
usual, natural and simple way would have been to have said,
"I give, devise and bequeath" those properties as described
in the will to those named, in the proportions they were to
take them. But she not only did not do that but, after

directing the residue of her estate (which consisted of every-thing left after the payment of her just debts, funeral expenses, etc.), to be divided by her executors into two equal parts, she simply said: "In the first part *they are to put* my interest in my house and lot," etc.   But that is not all, for after referring to the second part she said: "The first mentioned of the two above described *equal* parts of *the residue* of my estate, my executors are to assign, pay over, or convey as follows,"—thus again speaking of the two *equal* parts.   Then when she had provided for the McKims and was about to make provision for the Hemsleys she said: "*The remaining one-half* of my estate constituted as above described, my executors will pay, assign and convey as fol-lows" to the Hemsleys.

But as paragraph (3), which immediately follows (2), reads: "Into the second part they are to put *all the balance,* of my estate and property," except the household furniture, etc., "all of which they are to divide equally among my four brothers and my nieces," it is contended that the testatrix thus left to the Hemsleys all of her estate and property excepting the Saint Paul street house and lot and her inter-est in the coal properties, after payment of the debts, etc. But such construction would ignore and render meaningless not only the express directions to divide the residue of the estate into two *equal parts,* but the distinctly expressed inten-tion of the testatrix, when she named the beneficiaries of the first part, where she said, "The first mentioned of the two above described *equal* parts."   It seems clear to us that she only meant by paragraph (3) to say, all of the balance of her estate and property which remained after taking out for the first part the Saint Paul street property and the coal properties, and so much more as was necessary to carry out her intention that there should be two *equal* parts, and that she used the expression, which it must be admitted is an awkward one, in connection with the exception following, that is to say, the household furniture, etc., which she gave absolutely to the six Hemsleys mentioned.   There is much

more reason for holding that the household furniture, silver-
ware and articles of personal use were to be regarded as
part of the second part in the division of the residue, but
as those articles were distributed in the account passed by
the Orphans' Court of Baltimore before this bill was filed and
that account has not been disturbed, we will not discuss that
question further, but will sustain the decree of the lower
Court in regard to this branch of the case.

We do not think that the cases cited by the appellants,
*Cole, Executor,* v. *Ensor,* 3 Md. 446; *Douglass* v. *Black-
ford,* 7 Md. 8; *Mims* v. *Armstrong,* 31 Md. 87; *Zittle* v.
*Weller,* 63 Md. 190; *Needy* v. *Middlekauff,* 102 Md. 181,
and *Cochrane* v. *Harris,* 84 At. Rep. 499, are in any way
in conflict with that conclusion. When we read this will
in the light of the circumstances in which the testatrix was
placed, we are convinced that her intention was to leave
one-half of her estate to the McKims and the other half
to the Hemsleys, and there is nothing in any of the author-
ities cited to prevent her intention being carried out. The
general rule in the construction of wills is that, "where
there is a general and particular intent, apparent upon the
face, the general intent, although first expressed, shall con-
trol and overrule the particular, if there be a conflict
between them." *Chase* v. *Lockerman,* 11 G. & J. 185;
*Thompson* v. *Young,* 25 Md. 450, and *Taylor* v. *Watson,*
35 Md. 519. In this will, as we have seen, the general
intent that the two parts should be equal was not only
expressed in the first part of the will, but was repeated,
after what is claimed to be a particular intent was indicated,
—thus removing, as it seems to us, any possible doubt of the
intention of the testatrix.

2. The next question to be determined is whether the
devise or legacy to Hollins McKim lapsed by reason of Ch.
37 of the Act of 1910 (p. 323) (sec. 326 of Art. 93 of Code
of 1912). The original statute to prevent the lapsing of
devises, legacies and bequests had been in force one hundred
years when the Act of 1910 was passed—being Chapter 34

of Act of 1810. It was amended by Chap. 295 of Acts of 1832, which was passed to remove doubts which existed as to whether it extended to devisees or legatees, unless they were specially named. *Young* v. *Robinson,* 11 G. & J. 328. Those two acts were codified in the Code of 1860 in language which was repeated in the Codes of 1888 and 1904, and the Act of 1910 adopted the same language and then added, "provided, however, that this Act shall not apply to the last will, testament or codicil of any person dying after the passage of this Act, where the maker of said last will, testament or codicil, after the execution thereof and before the death of such devisee or legatee, shall become insane or btherwise incompetent to cancel, revoke, annul, obligate or alter said last will, testament or codicil." That Act was passed March 31st, 1910, and took effect the same day.

Most of the testimony before us relates to the question of the ability, *vel non,* of Mrs. Sterett to revoke or change her will. It is shown that on November 3rd, 1909, she was paralyzed, and on the 16th of that month J. Hemsley Johnson was, on the petition of two of her brothers, appointed trustee of a fund deposited in the Colonial Trust Company to her credit, with authority to withdraw said fund under the direction of the Court, in order to apply the same to her care, maintenance and support. The validity of that order has not been called into question in this case, but Mr. Johnson continued to act as such trustee until about the 17th of November, 1910, when Mrs. Sterett was adjudged insane. Mr. Johnson was appointed committee and continued to act as such until her death. The jury found that she was "of unsound mind and a lunatic, with lucid intervals, so that she is not capable of the government of herself or the management of her estate, and that she had been in such state of mind for more than one year past."

The language of the proviso in the Act of 1910 is very broad, but it certainly can not be contended that it means that if a testator becomes insane, or incompetent to act, between the execution of the will and the death of the devisee

or legatee, but recovers or has lucid intervals in which he could have cancelled, revoked or altered his will, the devise or legacy must lapse. Such a construction would be within the letter of the proviso, but surely not within its spirit and would be too unreasonable to be adopted by a Court. It is by no means certain that under the testimony in this case the testatrix could not have executed a valid deed or contract during a considerable part of the time between the death of the devisee and her death, and if that had been clearly shown we are not prepared to say that this proviso would apply, as in our judgment the expression, "shall become insane or otherwise incompetent" must be construed to mean, shall become insane or otherwise incompetent, and so continue to be, that the testator is unable to change his will. But that question would involve a discussion of a great deal of evidence and a number of questions, and as we are of the opinion that JUDGE HARLAN reached a proper conclusion as to the construction of the Act, although we have carefully considered the evidence, we will base our decision on the ground he relied on.

The will was made in 1897, Mr. McKim died May 17, 1911, and Mrs. Sterett died September 10th, 1911. If it be conceded that the testimony shows that the testatrix became incompetent to alter or revoke her will before the death of Mr. McKim, then we think it must likewise be conceded that she became so before the passage of the Act of 1910— that is to say, when she received the stroke of apoplexy, which resulted in paralysis. The evidence is stronger as to her lack of competency at that time and for some time afterwards, than it is of a more recent date. As shown by the Acts referred to above, it had been the policy of this State for one hundred years to prevent a devise, legacy or bequest, from lapsing merely because the devisee or legatee had predeceased the testator, and our statute was originally much broader than most of those passed elsewhere on the subject. A lawyer of this State when called upon to draw a will would necessarily have been influenced by this well known pro-

vision of law that had been in force nearly ever since Maryland had been a State, and had been passed upon in many decisions of this Court, in which various questions had arisen. In providing for making devises or bequests to callateral relations, or to those not related at all to the testator, a careful lawyer would have advised his client of the result in case such a devisee or legatee died before the testator, so that he could provide for such a contingency if he did not want the property devised or bequeathed to pass to the heirs or next of kin of the devisee or legatee. In *Vogel* v. *Turnt,* 110 Md. 197, we quoted with approval from 18 *Am. & Eng. Ency. of Law,* 758, that "It must be presumed that the testator made the will in view of the statute and that he intended to have the statute prevail, unless the contrary appeared. The burden of showing the contrary is on the party claiming that the statute does not apply, and this burden is not lifted when it is made to appear that the legacies were prompted by personal regard for the legatees, for the fact that they were so prompted is not at all inconsistent with an intent to have them go to the descendants of the legatees in case the legatees themselves die before the testator." It had been decided as early as 1835, in *Glenn* v. *Belt,* 7 G. & J. 362, that a legacy protected by the statute went directly to persons *in esse* entitled to the distribution of the deceased legatee's estate, did not pass as assets to the executor or administrator of the deceased legatee and was not liable for his debts. Such is still the law of this State. *Wallace* v. *Du Bois,* 65 Md. 161; *Vogel* v. *Turnt, supra.*

When then this will was executed in 1897, it must be presumed, in the absence of something to the contrary, that the testatrix intended that the devise or bequest left to Mr. McKim should go to him, if living at the time of her death, and if not then living to those *in esse* entitled to his estate. The provision had so remained in her will for twelve years before she was stricken, and McKim & Company had failed more than two years before it is claimed she became incompetent to change her will, but she made no change in it. The

record shows that it was her desire and intention that the relatives of her husband (who by his will had left her the bulk, if not all, of her estate) should have one-half and her relatives the other half of her estate. It can therefore not be denied that if this devise or bequest must lapse, the one-half of her estate will go to those for whom it was not intended, and be taken from those she intended should have it. The same may be said of the wills of all testators similarly situated. When then a Court is called upon to construe this proviso, it should be careful not to extend its terms, which thus thwart the wishes and intention of a testatrix, beyond what its language imperatively requires. The proviso is devoid of any meritorious object, unless it be to protect those suffering from that awful affliction of insanity or mental incompetency to make a will. It could only be justified on the presumption that if not insane or otherwise incompetent the testator would change the will, or at least the assumption that he might have desired to do so.

Statutes which are retroactive in their effect are not favored, even if they do not conflict with vested or other rights guaranteed by the Constitution. They strike from behind, and not in the face, where they can be provided for or against. Some of them are exceedingly dangerous, as they are sometimes passed to reach particular cases which are not disclosed to the Legislature. When a statute is susceptible of a construction which will make it prospective, rather than retroactive, especially if by the latter manifest injury may be done, it is the duty of the Court to construe it to be prospective, and it should not be held to be retroactive unless its terms are such as to make that construction imperative. If the testators are given an oppurtunity to provide for such contingencies, it may possibly be well to have such a change in the statute law, at any rate that was for the Legislature and not for us to determine, but in order to justify us in holding that the Legislature intended by this provision to make it applicable to those already insane, or otherwise incompetent to change their wills, its terms must

be such as to prevent us from escaping that conclusion. Otherwise we must impute to the Legislature the intention of saying that, although it is apparent that this testatrix and others similarly situated intended to die testate, and not intestate, and to leave their properties to the devisees and legatees named, and in case they predeceased the testators then to those who under the laws of Maryland are entitled to take them, inasmuch as they are now insane or incompetent to change their wills, we, the members of the Legislature, will change them, will cause them to die intestate, as to all devises, legacies and bequests left by them to devisees and legatees who predeceased them, and will consequently divert their estates from those they presumably intended to enjoy them to those intended to be excluded.

Let us then consider the proviso. In the first place, if the Legislature had intended it to apply to the will of a person who had already become insane or incompetent it was so easy to say so in unmistakable language, that the omission to do so, is of itself a strong presumption against such a construction. It could then have said where the testator, after the execution of the will and before the death of such devisee or legatee, *"has or shall become insane or otherwise incompetent,"* etc. That would in plain terms have applied to cases where the testators had already become insane when the Act was passed and to those who became so in the future, but it used a term which "in its common and ordinary usage, unless accompanied by qualifying words which show a contrary intent, always refers to the future," 35 *Cyc.* 1451, or as said in 25 *A. & E. Ency of Law,* 635, "The word 'shall' in its common and ordinary usage, unless affected by qualifying words, refers to the future." It is true it is said in both of those authorities that it is often used in remedial statutes in a general sense, including both past and future, and should be so considered when a more restricted interpretation is not required, but in this case we think the more restricted interpretation is required in justice to those unfortunate people referred to in the proviso and in

justice to the legislature itself, and we are convinced that the common and ordinary usage of the term should be accepted.

The proviso was in terms only made applicable to the wills of persons dying after the passage of the Act. It may be said that it could not have legally applied to wills of persons who died before the passage of the Act, because those taking under them then had vested rights which could not be disturbed. That may be true, but the fact is that the Act is only applicable to wills of persons dying after its passage, and why should it not be held that the term "shall become" has its common and ordinary meaning, and refers only to cases where the decisee or legatee became insane after the passage of the Act? There are many reasons why it should be—one of the most important of which is that some notice of this most radical change in the law could thus be given to testators, so that they could take steps to meet the change. But if this testatrix was before March 31st, 1910, the date of the passage of the Act, insane or incompetent to change her will, and this proviso applies to her will, then it was simply condemned as no will as to this bequest, although it was made when she was perfectly competent to make it, and presumably with reference to the statute which had then been in force for eighty-seven years.

The proviso makes no provision for a case where the testator becomes insane or incompetent *after* the death of the devisee or legatee, and that was doubtless because he was supposed to have some opportunity to change his will if he desired to do so. Yet if the proviso does apply to the will of one who became insane or incompetent before the passage of the Act, the Legislature of Maryland deliberately pursued the usual and unfavored course and reached back to strike down a will which, until it passed the Act of 1910, was as valid in reference to the devise in question as to any other devise or bequest in it, and of course without giving the testatrix and others similarly situated any opportunity

to confirm what they had lawfully done or to alter their wills, if they so desired.

So without prolonging the discussion of this branch of the case we are of opinion that the proviso was not intended to apply to a case where the testator became insane or incompetent before the passage of the Act. We have more doubt as to whether the judge of the lower Court ought not to have gone further, and have held that it was only intended that the proviso should apply to wills made after the passage of the Act than we have as to the correctness of his conclusion that it does not apply when the testator becomes insane or otherwise incompetent after the passage of the Act, but we will not pass on that question.

3. There can be no doubt under our decisions that the legacy to Hollins McKim passed to those entitled to it free from all indebtedness there may have been due from him to the testatrix. *Glenn* v. *Belt,* 7 G. & J. 367; *Wallace* v. *Du Bois,* 65 Md. 161; *Vogel* v. *Turnt,* 110 Md. 199.

4. In our judgment the evidence in the case shows that S. Sterett McKim was a partner in fact in the firm of McKim & Company. In answer to the question, "Will you state your connection with the firm of McKim & Company?" he replied, "My connection was that in certain respects as a partner—as a member of the firm." He was first employed in 1884 by Hollins McKim who conducted the business of the firm and in 1886 there was a change in the arrangements. When asked what that change was, he replied, "The change was that I should be known as a member of the firm." That continued until the time of the receivership. He said he was held out to the public as a member of the firm; that his duties were more in attending to the business on the local stock exchange, which he attended to. He and Hollins McKim were both members of the stock exchange and their seats were paid for by the firm; he was known generally as a member of the firm and was so held out; he and Hollins McKim were the only persons authorized to sign the firm name to checks and drafts. The agreement with Hollins

McKim was that he (Sterett McKim) was to receive a certain guaranteed salary of $2,400 a year, and if the profits exceeded $24,000 a year he was to receive one-tenth of the net profits. A receiver was appointed on July 1st, 1907, on a bill filed by him and a creditor of the firm. In the bill it was alleged: "That your orator, S. Sterett McKim, while a member of said firm and contributing his services to the business, has never contributed or agreed to contribute any capital thereto"; "That your orator, S. Sterett McKim, desires to have the partnership affairs wound up and his liabilities, if any such there are, determined," and one of the prayers of the bill was, "That the partnership of Hollins McKim and S. Sterett McKim, trading as McKim & Company, be dissolved." S. Sterett McKim swore to that bill. Hollins McKim admitted the matters and facts set forth in it and a receiver was appointed the same day. The order of Court directed the receiver to take charge and possession of the assets of every nature whatsoever belonging to the firm of Hollins McKim or S. Sterett McKim and they were ordered to so deliver them to the receiver. Subsequently S. Sterett McKim did turn over to the receiver certain policies of insurance on his life and the amount realized was distributed to the creditors. Other facts might be referred to, but it is sufficient to say, that under those proven and under the decisions of this Court, we can have no doubt that he was a partner of Hollins McKim, and as such liable for the firm debts.

5. It became necessary therefore for us to determine whether the Statute of Limitations bars the claim of the executors against him. As the firm went into the hands of the receiver July 1st, 1907, and this bill was not filed until January 5, 1912, the claim of Mrs. Sterett, who was a depositor with the firm of the amount of $12,587.76 is barred unless it has been acknowledged by Mr. McKim within three years in such way as to remove the bar. Several payments have been made by the receiver to Mrs. Sterett and those representing her—leaving a balance due

according to the allegations of the bill of $10,146.94, as of September 10, 1911. The executors claim that they are entitled to apply the bequest of Mrs. Sterett to the payment of that claim as far as necessary to pay it. That will be considered later, but the real question now under consideration is whether a paper given by Mr. McKim to the receiver removes the bar of the statute. It is as follows: "I hereby authorize Charles Morris Howard, receiver in this case, to distribute to the creditors of McKim and Company any and all sums heretofore or hereafter paid by me to said receiver, and any and all sums heretofore or hereafter received by the receiver on my account and especially the amounts collected by said receiver on my life insurance policies in the Aetna. Life Insurance Company and the Northwestern Life Insurance Company. Witness my hand and seal this 16th day of June, 1911."

Before that was given the creditors of McKim & Company and the amounts due them had been definitely ascertained, several audits had been stated and distributions made in the case to which Mr. McKim was a party. Amongst the debts proven and allowed was the one due Mrs. Sterett. In this State an express promise to pay is not necessary in order to remove a debt from the bar of the statute, but "The acknowledgment of a subsisting debt, unaccompanied with any sufficient cause for not paying it, will remove the bar of the statute. This was laid down in the case of *Oliver* v. *Gray,* 1 H. & G. 204, and is fortified by other decisions." *Gill* v. *Donovan,* 96 Md. 523. In Brantly's notes to *Oliver* v. *Gray,* which is the leading case in this State on the subject, many cases decided prior to that note are cited. Of those since decided we will only cite *Shipley* v. *Shilling,* 66 Md. 558; *Babylon* v. *Duttera,* 89 Md. 444; *Beeler* v. *Clarke,* 90 Md. 221. What was said in *Shipley* v. *Shilling,* and approved in *Houck* v. *Houck,* 112 Md. 122, will show that this paper signed by Mr. McKim, was sufficiently definite to remove the bar. There can be no doubt that in this case Mrs. Sterett was a creditor of the firm and Mr. McKim knew of the in-

debtedness to her.   We are of opinion that the acknowledgment did remove the bar of the statute.

6. It was said in *Armiger* v. *Reitz,* 91 Md. 342: "That it is the right and duty of an executor or administrator to retain from the share of a distributee or the interest of a legatee in the personal estate, the amount due by the latter to the decedent, was declared to have been for many years the settled law in Maryland in the case of *Gosnell, Trustee,* v. *Flack,* 76 Md. 426." See also *Hoffman* v. *Armstrong,* 90 Md. 123, and *Hoffman* v. *Hoffman,* 88 Md. 60.

It does seem to be peculiarly unfortunate that Mr. Sterett McKim should thus be deprived of what the testatrix left him, while what she left Mr. Hollins McKim, who was the active member of the firm of McKim and Company, is not liable for its debts but under the facts proven, and the laws applicable to those facts, it is not within the power of the Court to relieve him.   His conduct in connection with this case, as shown by the record, has been most commendable, and his testimony was frank and fair, and if the parties who get the money of this old lady, who made special mention of this namesake of her husband, arrange in some way to relieve him from at least part of the claim, they will doubtless to that extent carry out the wishes of their benefactress and not do more than is just.

We have not attempted to cite many of the numerous cases referred to by the respective solicitors, but we have not overlooked them or failed to consider them.   It follows from what we have said that the decree appealed from must be affirmed, but we will direct the costs of the three appeals to be paid out of the estate of the testatrix.

> *Decree affirmed, the costs in the three appeals to be paid out of the estate of the testatrix.*